**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **ANA MARIE TURNER,** individually and on behalf of all others similarly situated, | ) ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 1:24-cv-00510 |
| vs. | ) | |
| | ) | |
| **ASCENSION HEALTH** | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

### PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

Plaintiff, Ana Marie Turner ("Plaintiff") brings this Class Action Complaint ("Complaint") against Ascension Health, a non-profit Missouri entity ("Ascension" or "Defendant"), for its failure to properly secure and safeguard Plaintiff's and Class Members' protected health information and personally identifiable information stored within Defendant's information network, including without limitation, names, Social Security numbers, dates of birth, health plan information, and medical information (these types of information, *inter alia*, being thereafter referred to, collectively, as "protected health information" or "PHI" and "personally identifiable information" or "PII").

Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of counsel, and facts that are a matter of public record.

### INTRODUCTION

1.     This is a civil action seeking monetary damages and injunctive and declaratory relief from Defendant Ascension.

2.     Plaintiff further seeks to hold Defendant responsible for not ensuring that the PHI/PII was maintained in a manner consistent with industry, the Health Insurance Portability and

Accountability Act of 1996 ("HIPAA") Privacy Rule (45 CFR, Part 160 and Parts A and E of Part 164), the HIPAA Security Rule (45 CFR Part 160 and Subparts A and C of Part 164) and other relevant standards.

3. Moreover, as an ongoing harm resulting from the Data Breach, Plaintiffs and Class Members are unable to effectively communicate with their healthcare providers and/or receive the requisite medical care and attention they need for months following the Data Breach because Ascension's network systems, including its MyChart patient portal, remained offline and were inaccessible to patients. The MyChart patient portal is the primary way Ascension providers communicate with patients and families and patients have access to their records.

4. On information and belief, on or around May 9, 2024, Ascension's network systems were unauthorizedly accessed in a ransomware attack, resulting in the unauthorized disclosure of the Personal Information of Plaintiffs and the Class Members, including names, dates of birth, patient records, Social Security numbers, and other PHI (the "Data Breach").

5. As explained below, Plaintiffs and Members of the Class have suffered significant injury and damages due to the Data Breach permitted to occur by Ascension, and the resulting misuse of their Personal Information and fraudulent activity, including monetary damages including out-of-pocket expenses, including those associated with the reasonable mitigation measures they were forced to employ, and other damages. Plaintiff and the Class also now forever face an amplified risk of *further* misuse, fraud, and identity theft due to their sensitive Personal Information falling into the hands of cybercriminals as a result of the tortious conduct of Defendant.

6. On behalf of themselves and the Class preliminarily defined below, Plaintiff brings causes of action for negligence, negligence *per se*, breach of implied covenant and good faith and

air dealing, and in the alternative unjust enrichment.  Plaintiff seek damages and injunctive and declaratory relief arising from Ascension's failure to adequately protect their highly sensitive Personal Information.

## NATURE OF THE ACTION

7.      This class action arises out of a reported May 9, 2024 cybersecurity incident, resulting in a data breach ("Data Breach") from Ascension's failure to implement reasonable and industry standard data security practices.

8.      According to the Defendant's website, Ascension is one of the nation's leading non-profit and Catholic health systems.  Ascension includes approximately 134,000 associates, 35,000 affiliated providers and 140 hospitals, serving communities in 19 states and the District of Columbia.

9.      On May 10, 2024, the FBI and the Cybersecurity and Infrastructure Security Agency (CISA) released a statement that the Black Basta gang is targeting US critical infrastructure, including the healthcare sector.  See:  https://www.cisa.gov/sites/default/files/2024-05/aa24-131a-joint-csa-stopransomware-black-basta_0.pdf

10.     According to CRN, it was the Black Basta Ransomware attack that brought down Ascension IT Systems.  See:  https://www.crn.com/news/security/2024/black-basta-ransomware-attack-brought-down-ascension-it-systems-report

11.     Four sources briefed on the investigation told CNN that Ascension suffered a ransomware attack, in which cybercriminals typically try to lock computers and steal data for extortion.     See:     https://www.cnn.com/2024/05/10/tech/cyberattack-ascension-ambulances-hospitals/index.html

12.     On or about May 12, 2024, Senior Director of External Communications at Ascension Florida, Gary Nevolis, reported to the media that "they have determined it to be a ransomware incident."   See: https://www.msn.com/en-us/news/us/ascension-health-care-under-investigation-following-cyber-security-attack/ar-BB1mgyAX

13.     On or about May 11, 2024, *USA Today* reported, "Health care workers at Ascension Wisconsin sites reported not having access to Epic, the system used for storing patients' medical information and managing their care."   See: https://www.msn.com/en-us/health/other/hospitals-across-us-disrupted-after-cyberattack-targets-healthcare-titan-ascencion/ar-BB1m7LID?ocid=BingNewsSearch

14.     Plaintiff's and Class Members' sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was compromised and unlawfully accessed due to the Data Breach.

15.     Ascension collected and maintained certain personally identifiable information of Plaintiff and the putative Class Members (defined below), who are (or were) patients at Ascension and/or Ascension's patients.

16.     The Private Information compromised in the Data Breach included Plaintiff's and Class Members' "personally identifiable information" ("PII") and medical information, which is protected health information ("PHI", and collectively with PII, "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

17.     The Private Information compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target Private Information for its value to identity thieves.

4

18.     As a result of the Data Breach, Plaintiff and Class Members, suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

19.     The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patients' Private Information from a foreseeable and preventable cyber-attack.

20.     Defendant maintained the Private Information in a reckless manner.  In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks.  Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

21.     Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard Class

Members' Private Information; and failing to take standard and reasonably available steps to prevent the Data Breach.

22. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct because the Private Information that Defendant collected and maintained is now in the hands of data thieves.

23. Armed with the Private Information accessed in the Data Breach, data thieves have most likely engaged in identity theft and fraud and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taken out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

24. As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

25. Plaintiff and Class Members may also incur out of pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

26. Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to protect the Plaintiff and other Class Members from being subjected to the unauthorized access by an unknown third party.

27.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

28.     Plaintiff seeks remedies including, but not limited to, compensatory damages and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

## PARTIES

### a.  Plaintiff

29.     Plaintiff, Ana Marie Turner, is a natural person, resident and citizen of the State of Texas, residing in Hays County.

30.     On or about July 1, 2023, Plaintiff Ana Marie Turner provided her PII to Defendant Ascension Health while she was hospitalize for a fractured femur at their Ascension Seaton Hospital in Round Rock, Texas.

31.     At our about, Plaintiff Ana Marie Turner became aware from the news media of a cybersecurity breach at Ascension Health.

32.     Because Defendant Ascension obtained and continues to maintain Plaintiff's PII, Defendant owed her a legal duty and obligation to protect that PII from unauthorized access and disclosure.

33.     Plaintiff would not have entrusted her PII to Defendant ha she known that Defendant failed to maintain adequate data security.  Plaintiff's PII was compromised and disclosed as a result of defendant's inadequate data security, which resulted in the Data Breach.

**b.  Defendant**

34.     Defendant, Ascension Health, is a non-profit corporation properly recognized and sanctioned by the laws of the State of Missouri, with its headquarters located at 4600 Edmundson Road, St., St. Louis, Missouri 63134, in the County of St. Louis.

35.     Defendant, Ascension has 140 hospitals, serving communities in 19 states and the District of Columbia.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that (1) this action is a class action with more than a thousand (1,000) Class Members; (2) Defendant is a Missouri Corporation, with health care facilities/hospitals in Texas;  (3) Plaintiff and members of the Class are citizens of the United States, and members of the Class consists of citizens of nineteen States and the District of Columbia, thus satisfying the minimal diversity requirement of 28 U.S.C. § 1332(d)(2)(A); and (4) the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interests and costs.

37.     The acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

38.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to Plaintiff's claims took place within this District, and Defendant does business in this Judicial District.

## FACTUAL ALLEGATIONS

**Background**

39.     Defendant is a healthcare company that provides hospital care and medical care services to approximately 35,000 affiliated providers and 140 hospitals, serving communities in 19 states and the District of Columbia.

40.     Plaintiff and Class Members are current and former patients at Defendant and/or Defendant's clients.

41.     Upon information and belief, in the course of collecting Private Information from patients, including Plaintiff, Defendant promised to provide confidentiality for patient data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

42.     Defendant provides on its website that:

Our Commitment:   "We are committed to maintaining the privacy and confidentiality of your health information."

Our Responsibilities:  "We are required by law to maintain the priacy and security of your health information." [1]

43.     In the course of their relationship, patients, including Plaintiff and Class Members, provided Defendant with their Private Information, which Defendant could not perform its regular business operations without.

---

[1] https://healthcare.ascension.org/npp

44.     Plaintiff and Class Members, as former and current patients of Defendant and/or Defendant's clients, relied on these promises and on this sophisticated business entity to keep their sensitive Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.  Patients, in general, demand security to safeguard their Private Information, especially when PHI and other sensitive Private Information is involved.

**The Cybersecurity Data Breach**

45.     In an online notice published to Defendant's website (the "Notice") on May 9, 2024 at 5:30 p.m. Central Time, Defendant asserts that:

> "On May 8, Ascension detected unusual activity in our network systems.  We have determined this is a cybersecurity incident.  We are working around the clock with internal and external advisors to investigate, contain, and restore our systems following a thorough validation and screening process."

> "Systems that are currently unavailable include our electronic health records system, MyChart (which enables patients to view their medical records and communicate with their providers), some phone systems, and various systems utilized to order certain tests, procedures and medications.  We have implemented established protocols and procedures to address these particular system disruptions in order to continue to provide safe care to patients."

46.     Omitted from the Notice Letter were the root cause of the cybersecurity incident, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again.  To date, these omitted details have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

47. Upon information and belief, the cyberattack was targeted at Defendant, due to its status as a healthcare entity that collects, creates, and maintains Private Information on its computer networks and/or systems.

48. The files containing Plaintiff's and Class Members' Private Information, that were targeted and stolen from Defendant.

49. Because of this targeted cyberattack, data thieves were able to gain access to and obtain data from Defendant that included the Private Information of Plaintiff and Class Members.

50. According to CRN, it was the Black Basta Ransomware attack that brought down Ascension IT Systems. [2]

51. This was supported by CNN that reported Ascension suffered a ransomware attack, in which cybercriminals typically try to lock computers and steal data for extortion. [3]

52. As evidenced by the Data Breach's occurrence, the Private Information contained in Defendant's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

53. Plaintiff further believes that his and Class Members' Private Information has been or soon will be disseminated on the dark web, to be available for purchase, because that is the *modus operandi* of cybercriminals.

---

[2] https://www.crn.co m/news/security/2024/black-basta-ransomware-attack-brought-down-ascension-it-systems-report

[3] https://www.cnn.com/2024/05/10/tech/cyberattack-ascension-ambulances-hospitals/index.html

.

54.     Defendant had obligations created by the FTC Act, HIPAA, contract, state and federal law, common law, and industry standards to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

**Data Breaches Are Preventable**

55.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

56.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

57.     To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

a.     Implement an awareness and training program. Because end users are targets, patients and individuals should be aware of the threat of ransomware and how it is delivered.

b.     Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c.     Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d.     Configure firewalls to block access to known malicious IP addresses.

e.     Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f.  Set anti-virus and anti-malware programs to conduct regular scans automatically.

g.  Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h.  Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i.  Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

j.  Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

k.  Consider disabling Remote Desktop protocol (RDP) if it is not being used.

l.  Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m.  Execute operating system environments or specific programs in a virtualized environment.

n.  Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[4]

58.  Given that Defendant was storing the Private Information of its current and former patients and its clients' patients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

---

[4] *Id.* at 3-4.

59.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and, upon information and belief, the exposure of the Private Information of thousands to tens of thousands of patients, including that of Plaintiff and Class Members.

**Defendant Acquires, Collects, And Stores Patients' Private Information**

60.     Defendant acquires, collects, and stores a massive amount of Private Information on its patients, its clients' patients, and other personnel.

61.     As a condition of obtaining medical services at Ascension and/or Ascension's clients, Defendant requires that patients entrust it with highly sensitive personal information.

62.     By obtaining, collecting, and using Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

63.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendant absent a promise to safeguard that information.

64.     Plaintiff and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

14

**Defendant Knew or Should Have Known of the Risk Because Healthcare Entities In Possession Of Private Information Are Particularly Suspectable To Cyber Attacks**

65.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities that collect and store Private Information, like Defendant, preceding the date of the breach.

66.     Data breaches, including those perpetrated against healthcare entities that store Private Information in their systems, have become widespread.

67.     According to the *2023 Annual Data Breach Report*, the number of data compromises in 2023 (3,205) increased by 78 percentage points compared to 2022 (1,801).[5] The ITRC set a new record for the number of data compromises tracked in a year, up 72 percentage points from the previous all-time high in 2021 (1,860).

68.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

---

[5] https://www.idtheftcenter.org/publication/2023-data-breach-report/

69.     On March 15, 2024, the Department of Health and Human Services sent out a bulletin to warn health and public health sector organizations that Black Basta is a credible threat to the sector. [6]

70.     Defendant knew and understood unprotected or exposed Private Information in the custody of healthcare entities, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

71.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

72.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

73.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

74.     The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

75.     As a healthcare entity in custody of its patients' and its clients' patients' Private Information, Defendant knew, or should have known, the importance of safeguarding Private

---

[6] https://www.hhs.gov/sites/default/files/black-basta-threat-profile.pdf

Information entrusted to them by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach.  Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

**Value Of Personally Identifiable Information**

76.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[7] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[8]

77.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[9]

78.     For example, PII can be sold at a price ranging from $40 to $200.[10]

---

[7] 17 C.F.R. § 248.201 (2013).

[8] 9 *Id.*

[9] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-darkweb-how-much-it-costs/ (last visited Oct. 17, 2022).

[10] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-yourpersonal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

Criminals can also purchase access to entire company data breaches from $900 to $4,500.[11]

79.     PII can sell for as much as $363 per record according to the Infosec Institute.[12] PII is particularly valuable because criminals can use it to target victims with frauds and scams.

80.     Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

81.     Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."

82.     According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[13]

83.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to Ascension.

---

[11] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymousbrowsing/in-the-dark/ (last visited Oct. 217, 2022).

[12] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited May 7, 2023).

[13] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-andsometimes-crush-hospitals/#content (last accessed July 20, 2021)

84.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[14]

85.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

86.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used.  According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches: [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[15]

**Defendant Fails To Comply With FTC Guidelines**

87.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

---

[14] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10xprice-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).

[15] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).

88.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[16]

89.     The guidelines also recommend that healthcare businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[17]

90.     The FTC further recommends that healthcare companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that thirdparty service providers have implemented reasonable security measures.

91.     The FTC has brought enforcement actions against healthcare entities for failing to protect patient data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential patient data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C.

---

[16] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protetingpersonal-information.pdf (last visited Oct. 17, 2022).

[17] 18 *Id.*

§ 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

92.     These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g., In the Matter of LabMd, Inc., A Corp*, 2016-2 Trade Cas. (Ascension) ¶ 79708, 2016 WL 4128215, at \*32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

93.     Defendant failed to properly implement basic data security practices.

94.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

95.     Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of its patients and its clients' patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**Defendant Fails To Comply With HIPAA Guidelines**

96.     Defendant is a business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

97.     Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[18] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

98.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

99.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

100.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

101.    "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

102.    HIPAA's Security Rule requires Defendant to do the following:

a.      Ensure the confidentiality, integrity, and availability of all electronic    protected health information the covered entity or business associate   creates, receives, maintains, or transmits;

b.      Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;
c.      Protect against any reasonably anticipated uses or disclosures of such   information that are not permitted; and

---

[18] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

d.  Ensure compliance by its workforce.

103.  HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

104.  HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

105.  The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*."[19]

106.  HIPAA requires a business associate to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of

---

[19] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).

23

the business associate or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

107.    HIPAA requires a business associate to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

108.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule.  *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[20] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.

Defendant Fails To Comply With Industry Standards

109.    As noted above, experts studying cyber security routinely identify healthcare entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

---

[20] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.

110.    Several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

111.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

112.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

113.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and upon information and belief, Defendant failed to comply with at least one––or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## COMMON DAMAGES

114.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; I invasion of privacy; and (f) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

**The Data Breach Increases Victims' Risk Of Identity Theft**

115.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

116.    The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

117.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals

who then utilize the information to commit a variety of identity theft related crimes discussed below.

118.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt crimes against the individual to obtain more data to perfect a crime.

119.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

120.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages. [21]

121.     With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

---

[21] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth,

122.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

123.    The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiff and the other Class Members. and more.  As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web.  Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolenfrom-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-inunderground-stolen-from-texas-life-insurance-finn/ (last visited on May 26, 2023).

28

124.    Thus, even if certain information (such as Social Security numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

125.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**Loss Of Time To Mitigate Risk Of Identity Theft And Fraud**

126.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud.  Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

127.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach.

128.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[22]

---

[22] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

129.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[23]

130.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[24]

**Diminution Value Of Private Information**

131.    PII and PHI are valuable property rights.[25] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

---

[23] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

[24] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

[25] *See, e.g.,* Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional

132.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[26]

133.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[27,28]

134.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[29]

135.    Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[30]

136.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release.  However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss.  Moreover, the Private Information is financial assets.") (citations omitted) now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

---

[26] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[27] https://datacoup.com/

[28] https://digi.me/what-is-digime/

[29] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

[30] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

137.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to Ascension.

138.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

139.    The fraudulent activity resulting from the Data Breach may not come to light for years.

140.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

141.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary**

142.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.,* opening bank accounts in the victims' names to make

purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

143.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her personal information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

144.    Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

145.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member.  This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.  This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

**Loss Of The Benefit Of The Bargain**

146.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members the benefit of their bargain. When agreeing to pay Defendant and/or its clients for the provision of medical services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Representative Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant and/or its clients.

## PLAINTIFF TURNER'S EXPERIENCE

147.    Plaintiff, Ana Marie Turner has utilized the medical/hospital services of Ascension Seaton Hospital in Round Rock, Texas in the past year for treatment of a fractured femur.

148.    Plaintiff, Ana Marie Turner has been a client of Plaintiff's counsel for the past three years.

149.    Plaintiff Ana Marie Turner, who is also a member of the Class has utilized the medical services of Ascension Seaton Hospital in Round Rock, Texas this past year.

150.    In order to obtain medical services from Ascension Seaton Hospital Plaintiff Turner was required to provide Personal Information, directly or indirectly, to Defendant.   The patient records, covering the Turners' medical care from Defendant are electronically stored that were subject to the cybersecurity attack.

151.    Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff's Private Information in its system.

152.    Plaintiff Turner is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.   Plaintiff would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

153.    Upon information and belief, Plaintiff's PII and/or PHI was improperly accessed and obtained by unauthorized third parties in the Data Breach.

154.    Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and

opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

155.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

156.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

157.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

158.    Plaintiff Turner has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

159.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

160.    Specifically, Plaintiff proposes the following class definitions, subject to amendment as appropriate:

**Nationwide Class:** *All persons whose PII was compromised as a result of the Data Breach, for which Defendant provided notice in May 2023 (the "Class").*

**Texas Subclass:** *All persons from Texas whose PII was compromised as a result of the Data Breach, for which Defendant provided notice in May 2023 (the "Texas Subclass").*

161.    Excluded from the Classes are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns.  Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

162.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes, as well as add subclasses, before the Court determines whether certification is appropriate.

163.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

164.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown to Plaintiff and exclusively in the possession of Defendant, upon information and belief, thousands of individuals were impacted in the Data Breach.

165.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

> a.    Whether Defendant engaged in the conduct alleged herein;
>
> b.    Whether Defendant's conduct violated the FTCA and/or HIPAA;
>
> c.    When Defendant learned of the Data Breach;
>
> d.    Whether Defendant's response to the Data Breach was adequate;

e.      Whether Defendant unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

f.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g.      Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.      Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

i.      Whether Defendant owed a duty to Class Members to safeguard their Private Information;

j.      Whether Defendant breached its duty to Class Members to safeguard their Private Information;

k.      Whether hackers obtained Class Members' Private Information via the Data Breach;

l.      Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

m.      What damages Plaintiff and Class Members suffered as a result of Defendant's misconduct;

n.      Whether Defendant's conduct was negligent;

o.      Whether Defendant was unjustly enriched;

p.      Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

q.      Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

r.      Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

166.    Typicality. Plaintiff's claims are typical of those of other Class Members because

Plaintiff's Private Information, like that of every other Class Member, was compromised in the

37

Data Breach. Plaintiff's claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

167.    Adequacy of Representation. Plaintiff will adequately represent and protect the interests of Class Members. Plaintiff's counsel is currently litigating a similar data breach with another health care facility in Circuit Court of Cook County Illinois, Chancery Division. Plaintiff's counsel has filed a separate class action against the same Defendant, for the same data breach incident with a different Plaintiff in the U.S. District Court for the Northern District of Illinois (*Negron v. Ascension Health*, Case No. 1:24-cv-0857). Plaintiff's counsel anticipates these cases will be consolidated and intends to enlist the support of other law firms to bring added experience in litigating data privacy in class actions.

168.    Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

169.    Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class

Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

170.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

171.    Finally, all members of the proposed Class are readily ascertainable.  Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## CAUSES OF ACTION
### FIRST COUNT -NEGLIGENCE
### (On Behalf of Plaintiff and all Class Members)

172.    Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 171.

173.    At all times herein relevant, Defendant owed Plaintiff and Class Members a duty of care, *inter alia*, to act with reasonable care to secure and safeguard their PHI/PII and to use commercially reasonable methods to do so. Defendant took on this obligation upon accepting and storing Plaintiff's and Class Members' PHI/PII on its computer systems and networks.

174.    Among these duties, Defendant was expected:

a. to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the PHI/PII in its possession;

b. to protect Plaintiff's and Class Members' PHI/PII using reasonable and adequate security procedures and systems that were/are compliant with industry-standard practices;

c. to implement processes to quickly detect the Data Breach and to timely act on warnings about data breaches; and

d. to promptly notify Plaintiff and Class Members of any data breach, security incident or intrusion that affected or may have affected their PHI/PII.

175.    Defendant knew that the PHI/PII was private and confidential and should be protected as private and confidential and, thus, Defendant owed a duty of care not to subject Plaintiff and Class Members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

176.    Defendant knew or should have known of the risks inherent in collecting and storing PHI/PII, the vulnerabilities of its data security systems and the importance of adequate security. Defendant knew about numerous, well-publicized data breaches. 91. Defendant knew or should have known that its data systems and networks did not adequately safeguard Plaintiff's and Class Members' PHI/PII.

177.    Only Defendant was in the position to ensure that its systems and protocols were sufficient to protect the PHI/PII that Plaintiff and Class Members had entrusted to it.

178.    Defendant breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI/PII.

179.    Because Defendant knew that a breach of its systems could damage hundreds of individuals, including Plaintiff and Class Members, Defendant had a duty to adequately protect its data systems and the PHI/PII contained thereon.

180.    Plaintiff's and Class Members' willingness to entrust Defendant with its PHI/PII was predicated on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant had the ability to protect its systems and the PHI/PII it stored on them from attack. Thus, Defendant had a special relationship with Plaintiff and Class Members.

181.    Defendant also had independent duties under state and federal laws that required Defendant to reasonably safeguard Plaintiff's and Class Members' PHI/PII and promptly notify them about the Data Breach. These "independent duties" are untethered to any contract between Defendant and Plaintiff and/or the remaining Class Members.

182.    Defendant breached its general duty of care to Plaintiff and Class Members in, but not necessarily limited to, the following ways:

a. by failing to provide fair, reasonable or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI/PII;

b. by failing to timely and accurately disclose that Plaintiff's and Class Members' PHI/PII had been improperly acquired or accessed;

c. by failing to adequately protect and safeguard the PHI/PII by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured PHI/PII;

d. by failing to provide adequate supervision and oversight of the PHI/PII with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather Plaintiff's and Class Members' PHI/PII, misuse the PHI/PII and intentionally disclose it to others without consent;

e. by failing to adequately train its employees to not store PHI/PII longer than absolutely necessary;

f. by failing to consistently enforce security policies aimed at protecting Plaintiff's and the Class Members' PHI/PII;

g. by failing to implement processes to quickly detect data breaches, security incidents or intrusions; and

h. by failing to encrypt Plaintiff's and Class Members' PHI/PII and monitor user behavior and activity in order to identify possible threats.

183.    Defendant's willful failure to abide by these duties was wrongful, reckless and/or grossly negligent in light of the foreseeable risks and known threats.

184.    As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiff and Class Members have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

185.    There is a close causal connection between Defendant's failure to implement security measures to protect Plaintiff's and Class Members' PHI/PII and the harm suffered, or risk of imminent harm suffered, by Plaintiff and Class Members. Plaintiff's and Class Members' PHI/PII was accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PHI/PII by adopting, implementing and maintaining appropriate security measures.

186.    Defendant's wrongful actions, inactions and omissions constituted (and continue to constitute) common law negligence.

187.    The damages Plaintiff and Class Members have suffered (as alleged above) and will continue to suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

188.    Additionally, 15 U.S.C. § 45 (FTC Act, Section 5) prohibits "unfair […] practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or

practice by businesses, such as Defendant, of failing to use reasonable measures to protect PHI/PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

189.    Defendant violated 15 U.S.C. § 45 by failing to use reasonable measures to protect PHI/PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PHI/PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

190.    Defendant's violation of 15 U.S.C. § 45 constitutes negligence *per se.* Defendant also violated the HIPAA Privacy and Security rules which, likewise, constitutes negligence *per se*.

191.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer injury, including but not limited to (i) actual identity theft, (ii) the loss of the opportunity of how their PHI/PII is used, (iii) the compromise, publication and/or theft of their PHI/PII, (iv) out-of-pocket expenses associated with the prevention, detection and recovery from identity theft, tax fraud and/or unauthorized use of their PHI/PII, (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from embarrassment and identity theft, (vi) lost continuity in relation to their personal records, (vii) the continued risk to their PHI/PII, which may remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PHI/PII in its continued possession, and (viii) future costs in terms of time, effort and money that will be expended to

prevent, detect, contest and repair the impact of the PHI/PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

192.     As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including but not limited to anxiety, emotional distress, loss of privacy and other economic and noneconomic losses.

193.     Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer the continued risks of exposure of their PHI/PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PHI/PII in its continued possession.

## SECOND COUNT - NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and all Class Members)

194.     Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 171.

195.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

196.     Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Private Information and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of

Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

197.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l).  Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

198.    Defendant violated HIPAA (and similar state statutes) by failing to use reasonable measures to protect Private Information and not complying with industry standards.

199.    Defendant's violation of Section 5 of the FTC Act and HIPAA (and similar state statutes) constitutes negligence *per se.*

200.    Class members are consumers within the class of persons Section 5 of the FTC Act and HIPAA (and similar state statutes) were intended to protect.

201.    Moreover, the harm that has occurred is the type of harm the FTC Act and HIPAA (and similar state statutes) were intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

202.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

203.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk

of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information Case implementing, and maintaining appropriate security measures.

204.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

205.    As a direct and proximate result of Defendant's negligence per se, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

206.    Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized

disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

207.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

208.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

209.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

### THIRD COUNT – IMPLIED BREACH OF CONTRACT
### (On Behalf of Plaintiff and all Class Members)

210.    Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 171.

211.    When Plaintiff and Class Members provided their PII to Defendant in exchange for a medical services and treatment, they entered into implied contracts and they did so with the belief that Defendant had agreed to reasonably protect such information.

212.    Defendant solicited, offered, and invited Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

213.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

214.    Plaintiff and Class Members provided services to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so. Class Members similarly paid money to Defendant for its services with the reasonable belief and expectation that Defendant would use part of that payment to obtain adequate data security for the PII consumers entrusted to Defendant. Defendant failed to do so.

215.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

216.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

217.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

218.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII.

219.    As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

220.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

221.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit

to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## FOURTH COUNT - BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and All Class Members)

222.    Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 171.

223.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became health care providers of Plaintiff's and Class Members' PII, Defendant became a fiduciary by its undertaking and heighten relationship of the PII, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

224.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with them, in particular, to keep secure their PII.

225.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discovery, investigate the Data Breach in a reasonable and practicable period.

226.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' PII.

227.    Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PII.

228.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

229.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

### FIFTH COUNT - INTRUSION UPON SECLUSION/INVASION OF PRIVACY
### (On Behalf of Plaintiff and All Class Members)

230.    Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 171.

231.    The State of Texas recognizes the tort of Intrusion upon Seclusion, and adopts the formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts§ 652B (1977).

232.    Plaintiff and Class Members had a reasonable expectation of privacy in the PII that Defendant mishandled.

233.    Defendant's conduct as alleged above intruded upon Plaintiff's and Class Members' seclusion under common law.

234.    By intentionally failing to keep Plaintiff's and Class Members' PII safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff's and Class Members' privacy by:

- a. Intentionally and substantially intruding into Plaintiff's and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;

- b. Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and

- c. Intentionally causing anguish or suffering to Plaintiff and Class Members.

235.    Defendant knew that an ordinary person in Plaintiff or Class Members' position would consider Defendant's intentional actions highly offensive and objectionable.

236.    Defendant invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' private affairs by intentionally misusing and/or disclosing their PII without their informed, voluntary, affirmative, and clear consent.

237.    Defendant intentionally concealed from and delayed reporting to Plaintiff and Class Members a security incident that misused and/or disclosed their PII without their informed, voluntary, affirmative, and clear consent.

51

238.    The conduct described above was at or directed at Plaintiff and the Class
Members.

239.    As a proximate result of such intentional misuse and disclosures, Plaintiff and
Class Members' reasonable expectations of privacy in their PII was unduly frustrated and
thwarted. Defendant's conduct amounted to a substantial and serious invasion of Plaintiff's and
Class Members' protected privacy interests causing anguish and suffering such that an ordinary
person would consider Defendant's intentional actions or inaction highly offensive and
objectionable.

240.    In failing to protect Plaintiff's and Class Members' PII, and in intentionally
misusing and/or disclosing their PII, Defendant acted with intentional malice and oppression and
in conscious disregard of Plaintiff and Class Members' rights to have such information kept
confidential and private. Plaintiff, therefore, seeks an award of damages on behalf of herself and
the Class.

### SIXTH COUNT - IN THE ALTERNATIVE - UNJUST ENRICHMENT
### (On Behalf of Plaintiff and All Class Members)

241.    Plaintiff repeats and re-alleges each and every factual allegation contained in
paragraphs 1 through 171.

242.    Plaintiff brings this claim individually and on behalf of all Class Members.  This
count is plead in the alternative to the breach of implied contract count, the third count listed in
this Complaint.

243.    Representative Plaintiff and Class Members conferred a monetary benefit on
Defendant. Specifically, they paid for services from Defendant and/or its clients and in so doing
also provided Defendant with their Private Information.  In exchange, Representative Plaintiff and

Class Members should have received from Defendant the services that were the subject of the transaction and should have had their Private Information protected with adequate data security.

244.    Defendant knew that Representative Plaintiff and Class Members conferred a benefit on it in the form their Private Information as well as payments made on their behalf as a necessary part of their receiving services. Defendant appreciated and accepted that benefit. Defendant profited from these transactions and used the Private Information of Representative Plaintiff and Class Members for business purposes.

245.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments on behalf of or for the benefit of Representative Plaintiff and Class Members.

246.    As such, a portion of the payments made for the benefit of or on behalf of Representative Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

247.    Defendant, however, failed to secure Representative Plaintiff's and Class Members' Private Information and, therefore, did not provide adequate data security in return for the benefit Representative Plaintiff and Class Members provided.

248.    Defendant would not be able to carry out an essential function of its regular business without the Private Information of Representative Plaintiff and Class Members and derived revenue by using it for business purposes. Representative Plaintiff and Class Members expected that Defendant or anyone in Defendant's position would use a portion of that revenue to fund adequate data security practices.

249.     Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

250.     If Representative Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have allowed their Private Information to be provided to Defendant.

251.     Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Representative Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Representative Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit.  Representative Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

252.     Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained Representative Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

253.     Representative Plaintiff and Class Members have no adequate remedy at law.

254.     As a direct and proximate result of Defendant's conduct, Representative Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs

associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

255.   As a direct and proximate result of Defendant's conduct, Representative Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

256.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Representative Plaintiff and Class Members, proceeds that they unjustly received from them.  In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## JURY TRIAL DEMANDED

257.   Plaintiff demands a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.      For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to patient data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

D.      For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.   Prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. Requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. Requiring Defendant to delete, destroy, and purge the Private Information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. Requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v. Prohibiting Defendant from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vi.  Requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct

56

testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. Requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.  Requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. Requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x. Requiring Defendant to conduct regular database scanning and securing checks;

xi. Requiring Defendant to establish an information security training program that includes at least annual information security training for all patients, with additional training to be provided as appropriate based upon the patients' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.    Requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.    Requiring Defendant to implement a system of tests to assess its respective patients' knowledge of the education programs discussed in the preceding

57

subparagraphs, as well as randomly and periodically testing patients' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.   Requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated; xv. Requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves; and

xvi.   Requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvii.   for a period of 5 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment.

E.   For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

F.   Ordering Defendant to pay for not less than five years of credit monitoring services for Plaintiff and the Class;

G.   For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

H.   For an award of punitive damages, as allowable by law;

58

I.      For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

J.      Pre- and post-judgment interest on any amounts awarded at the prevailing legal rate; and

K.      Such other and further relief as this court may deem just and proper.

Dated: May 13, 2024            Respectfully submitted,

                     /s/ T. J. Jesky
                     T. J. Jesky
                     Illinois Bar No.: 6325691
                     Law Offices of T. J. Jesky
                     205 N. Michigan Avenue, Suite 810
                     Chicago, IL 60601-5902
                     tj@jeskylaw.com
                     Telephone: 312-894-0130, Ext. 3
                     Fax: 312-489-8216
                     *Counsel for Plaintiff*